UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

JENNIFER LOWDER, administrator for the
estate of TIFFANY HELBLING,

Plaintiff,

v.

CAUSE NO. 3:22-CV-787 DRL

MARSHALL COUNTY SHERIFF'S
DEPARTMENT *et al.*,

Defendants.

OPINION AND ORDER

In May 2021, Tiffany Helbling was arrested after a traffic stop. She tragically passed away from pneumonia five days later while housed at the Marshall County Jail. Jennifer Lowder, on behalf of the Estate, alleges that the Marshall County Sheriff's Department, its staff, and the jail's medical contractor, Quality Correctional Care (QCC), violated Ms. Helbling's constitutional rights and state law by failing to provide adequate medical care. QCC requests partial summary judgment on Ms. Lowder's *Monell* claims. The Marshall County defendants request summary judgment on all counts. The court grants QCC's motion and then the other motion only in part.[1]

FACTUAL BACKGROUND

On May 18, 2021, law enforcement officers arrested Ms. Helbling for possessing a controlled substance, operating a motor vehicle while intoxicated with a passenger, and other related charges [54-1]. Officers took Ms. Helbling to the Marshall County Jail [*id.*]. She arrived at

---

[1] The Estate abandons claims under the Fourth and Eighth Amendments in count 1 and all claims against Devin Johnson, L.K. Kowalski, and Shan Jolley. The court thus enters summary judgment for these defendants and directs the clerk to term these parties too. The court likewise dismisses the unnamed deputies, nurses, and doctors as there is no need for John Doe defendants, particularly after summary judgment.

the jail around 11:45 pm, and Officer Jennifer Hendricks booked and admitted her [*id.*]. Jail records show Ms. Helbling tested negative for COVID-19, weighed 107 pounds, and had a temperature of 98.9 degrees [*id.*].

Ms. Helbling completed a suicide history report that concerned Officer Hendricks. Ms. Helbling reported having thought about harming herself and trying to cut her wrists just two weeks beforehand [54-3; 54-2 Tr. 21, 34]. Officer Hendricks placed Ms. Helbling on watch, and eventually officers placed her in a suicide smock until she could be seen by medical personnel the following day [54-2 Tr. 34].

As part of the booking process, Officer Hendricks also completed a Medical Screen History Report and asked a series of questions [*id.* Tr. 15-17; 54-4]. Ms. Helbling reported blood pressure issues and that she would likely detox from several prescription medications [54-4]. She took multiple prescription medications, and officers confiscated pills hidden on her person [*id.*; 54-2 Tr. 22-23]. She also reported having asthma, that she was missing her inhaler, and that she was coughing up "green stuff" (though she said she had recently smoked something) [54-4; 54-2 Tr. 28]. But when asked if she had been "experiencing a fever, serious headache, breathing issues, cough, fatigue, or dizziness," Ms. Helbling said no [54-2 Tr. 28]. Officer Hendricks recorded this information [54-4], printed it, and put it in the nurse's basket so that the nurse would see it when she arrived in the morning [54-2 Tr. 17].

Officer Hendricks testified that Ms. Helbling appeared to be under the influence of controlled substances during the booking [*id.* Tr. 19-20], but she didn't observe Ms. Helbling having any breathing problems, and she thought Ms. Helbling provided "good answers" [*id.* Tr.

23-24]. Early in the morning hours of May 19, 2021, Ms. Helbling was assigned to an observation cell (1122B) near the booking desk [54-5 at 8].

Marshall County contracts with Quality Correctional Care (QCC) for medical care [58-4]. The next morning, QCC's nurse, Mary Loftus, arrived and saw Ms. Helbling [58-6 Tr. 20]. This first visit happened through the cell door because Nurse Loftus couldn't enter the cell without staff [*id.* Tr. 28-29; 57]. Nurse Loftus noted after the visit that she had spoken with Ms. Helbling, who appeared emaciated, and instructed Ms. Helbling "to notify staff if she feels like she's going to withdraw from anything" [*id.* Tr. 21]. Ms. Helbling told Nurse Loftus she would be fine [*id.*].

Jennifer Ordway, a QCC social worker, met with Ms. Helbling on May 19, 2021. After Ms. Helbling denied any suicidal ideation, Ms. Ordway didn't take any more action [54-8 Tr. 21-22]. Jail staff continued to monitor Ms. Helbling on May 19, 20, and 21 [54-5]. During that time, there is no record of Ms. Helbling reporting any medical complaints to the staff, though she did tell them she hadn't been eating or drinking on May 22 [*id.* at 4].

Early the morning of May 22, Officers Hendricks and D.W. Johnson went to check on Ms. Helbling and observed a yellow-brown substance on the floor they believed to be vomit, so they initiated a gastrointestinal nausea and vomiting protocol [*id.*; 54-10 Tr. 13-14; 58-19 at 6]. They took her vitals to "make sure everything seem[ed] on the up and up" [54-10 Tr. 14]. Ms. Helbling said she had not been eating or drinking and had begun detoxing [54-5 at 4; 58-7 Tr. 67]. Officers made sure the cell was clean and told Ms. Helbling to let the staff know if she needed anything [58-7 Tr. 39-41; 54-5 at 4].

At the time the protocol sheet was completed, Ms. Helbling reported vomiting twice, stomach cramps, a temperature of 98 degrees, and no alarming vitals [58-19 at 6]. Officer

Hendricks testified that she did not believe there was any emergency at this point [58-7 Tr. 64]. The officers did not call for emergency care but completed the protocol so that Ms. Helbling would be seen by medical personnel [*id.* Tr. 63-64].

When Nurse Loftus arrived at the jail on May 22, she reviewed the notes and protocol for Ms. Helbling and went to see her a second time in the observation cell [58-6 Tr. 29-30; 54-6 Tr. 51]. She noted that Ms. Helbling was eating and instructed officers to check on her every four hours for safety [58-6 Tr. 30]. She contacted Dr. Eric Kammi Tchaptchet, a QCC physician, who ordered two medicines for nausea and gastrointestinal symptoms for Ms. Helbling [*id.*]. She didn't mention to Dr. Tchaptchet that Ms. Helbling had been coughing up green stuff [54-6 Tr. 58-59]. She also didn't tell Dr. Tchaptchet that Ms. Helbling had vomit in her cell, though she testified that in retrospect she found it significant and doesn't know why she didn't report it [*id.* Tr. 44]. Nurse Loftus said Ms. Helbing "was a mess" so she "got her teeth cleaned up and put them in her mouth and pulled her hair back and sat her up with some water" [*id.* Tr. 31]. She thought Ms. Helbling was experiencing detox symptoms [*id.* Tr. 32], and she believed it would have been appropriate to start the detox protocol [*id.* Tr. 52].

Around 2:00 p.m. on May 22, Nurse Loftus initiated a withdrawal flowsheet for Ms. Helbling (prescribed by the doctor) and recorded her vitals [*id.* Tr. 55; 58-19 at 7; 58-5 Tr. 25]. She instructed jail staff to continue to make sure Ms. Helbling was eating and drinking [58-19 at 4; 54-6 Tr. 29-30]. Officer Donna Tapia confirmed that Nurse Loftus gave instructions to monitor Ms. Helbling and to make sure she was eating and drinking, and she followed them [54-12 Tr. 53-54]. Later that day, Ms. Helbling was moved to a padded cell [54-5 at 2; 58-8 Tr. 22].

4

Around 5:44 p.m. on May 22, Officer Tapia checked on Ms. Helbling, who appeared cross-eyed and non-sensical at first, though Officer Tapia eventually sat her up and spoke to her [54-5 at 3; 54-12 Tr. 29-30]. Officer Tapia had her drink some water, and she asked for more and "made sense" [58-8 Tr. 55]. When Ms. Helbling received dinner, she did not eat it immediately, but Officer Tapia made sure that she ate a little bit and drank some fluids [*id.* Tr. 25]. Observation logs show that Officer Samantha Howard and Officer Tapia checked on Ms. Helbling again in her cell around 9:45 p.m. [54-5 at 2]. Throughout the night, officers noted her sleeping and some verbal contact; but around 3:13 a.m. on May 23, the observing officer noted that the inmate was lying down with her eyes open and could tell she was withdrawing "really bad" [*id.* 1-2]. That observation didn't prompt any further action.

At around 7:30 a.m. on May 23, Sergeant Shan Jolley and Officer Tapia checked on Ms. Helbling and gave her medications [*id.* 1; 58-8 Tr. 38]. Officer Tapia testified that Ms. Helbling either smelled like urine or there was urine on the floor, and she planned to get Ms. Helbling cleaned up after med pass, but she didn't record that interaction in the system [54-12 Tr. 36-38]. About half an hour later, at 8:02 a.m., Officer Howard asked Ms. Helbling through the intercom if she was okay, and Ms. Helbling nodded [54-5 at 1; 54-14 at 3]. At 8:12 a.m., Officer Howard brought Ms. Helbling breakfast, which she didn't move to get [58-9 Tr. 47; 54-14 at 3].

At 9:00 a.m., Sergeant Jolley and Officer Tapia noticed that Ms. Helbling was lying on her back without moving—"just flat out"—a change from her former sitting position [58-8 Tr. 39; 54-5 at 1]. Ms. Helbling didn't respond to officers, and Officer Tapia entered the cell and found Ms. Helbling non-responsive, even after rubbing her chest and calling her name [58-8 Tr. 39]. Officer Tapia could not find a pulse and called for an AED, and Sergeant Jolley called an

ambulance "right away," about 9:02 a.m. [*id.* Tr. 39-40]. Officer Tapia began CPR [*id.* Tr. 40; 54-14 at 3-4]. Paramedics took over at 9:10 a.m. and got a pulse back, but Ms. Helbling was pronounced dead at the local hospital later that day [54-14 at 1-3; 54-15 at 3]. An autopsy determined that she died of acute bilateral pneumonia [54-15 at 1].

## STANDARD

The court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in her favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). The court must construe all facts in the light most favorable to the non-moving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp./Nichols-Homeshield*, 200 F.3d 485, 491-92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

In its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Nor is the court "obliged to research and construct legal arguments for parties." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge,* 24 F.3d at 920. The court must grant summary judgment when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011).

"[I]t is the function of a court, with or without a motion to strike, to review carefully both statements of material facts and statements of genuine issues and the headings contained therein and to eliminate from consideration any argument, conclusions, and assertions unsupported by the documented evidence of record offered in support of the statement." *Mayes v. City of Hammond*, 442 F. Supp.2d 587, 596 (N.D. Ind. 2006). Expectations are clear. *See* Fed. R. Civ. P. 56(c)(1)(A) (parties must "cit[e] to *particular parts of materials* in the record") (emphasis added); N.D. Ind. L.R. 56-1(b)(2) (party must include "a citation *to evidence* supporting each dispute of fact") (emphasis added). The court will not scour the record without a suitable proffer. *See Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1017 (7th Cir. 2016); *Waldridge*, 24 F.3d at 923-24; *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Compliance with these rules demonstrates respect for the process, and it facilitates efficient rulings for the parties, something that cannot happen when the court is left trying to make sense of a lengthy record without that aid.

The parties presented a record of hundreds of pages and over 118 hours of video footage (initially without this video being reviewable). The Estate's response to the statement of material facts often contains bare denials or other empty statements, without any citations to evidence. This is ineffectual. At times, the Estate simply says, "see video," without citing anything specific of these 118 hours. This is unparticular. *See* Fed. R. Civ. P. 56(c)(1)(A). At times, the Estate inserts mere argument in the response to the statement of facts. This is improper. *See Mayes*, 442 F. Supp.2d at 595. Accordingly, the court deems admitted all facts in the defense's statement of material facts that have not been met with citations to evidence or with particularity.

DISCUSSION

A.    *Fourteenth Amendment Inadequate Medical Care Claim against Marshall County Officers (Count 1).*

The Estate alleges violations of Ms. Helbling's constitutional rights under 42 U.S.C. § 1983. Section 1983 serves as a procedural vehicle for lawsuits "vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). To establish a § 1983 claim, the Estate must show that Ms. Helbling was "deprived of a right secured by the Constitution or federal law, by a person acting under color of law." *Thurman v. Vill. of Homewood*, 446 F.3d 682, 687 (7th Cir. 2006). It may bring a § 1983 claim only against those individuals "personally responsible for the constitutional deprivation." *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 614 (7th Cir. 2002).

The Estate alleges that individual defendants violated Ms. Helbling's rights as a pretrial detainee to adequate medical treatment and accommodations. As a pretrial detainee, her rights arise under the Fourteenth Amendment.[2] *Miranda v. Cnty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). "Pretrial detainees cannot enjoy the full range of freedoms of unincarcerated persons." *Tucker v. Randall*, 948 F.2d 388, 391 (7th Cir. 1991) (citation and hyphen omitted). But they "stand in a different position" than convicted defendants because "they have not been convicted of anything, and they are still entitled to the constitutional presumption of innocence." *Pittman v. Madison Cnty.*, 108 F.4th 561, 566 (7th Cir. 2024). They are entitled to adequate medical care. *Miranda*, 900 F.3d at 350.

---

[2] The Estate thus appropriately abandons its earlier claims under the Fourth and Eighth Amendments.

To establish a violation of this right, a pretrial detainee must prove that "(1) there was an objectively serious medical need; (2) the defendant committed a volitional act concerning the [plaintiff's] medical need; (3) that act was objectively unreasonable under the circumstances in terms of responding to the [plaintiff's] medical need; and (4) the defendant act[ed] purposefully, knowingly, or perhaps even recklessly with respect to the risk of harm." *Gonzalez v. McHenry Cnty.*, 40 F.4th 824, 827-28 (7th Cir. 2022) (quotations omitted). The court considers the "totality of facts and circumstances" to determine whether a challenged action was objectively reasonable. *Mays v. Dart*, 974 F.3d 810, 819 (7th Cir. 2020).

Prisoners are "not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019), or entitled to "the best care possible," *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). It isn't enough to prove negligence or gross negligence. *Miranda*, 900 F.3d at 353-54. It isn't enough that a medical professional or officer was mistaken in his or her judgment. *Hildreth v. Butler*, 960 F.3d 420, 425-26 (7th Cir. 2020). "The objective reasonableness of a decision to deny medical care . . . does not consider the defendant's *subjective* views about risk of harm and necessity of treatment," but instead "turns on whether a reasonable officer in the defendant's shoes would have recognized that the plaintiff was seriously ill or injured and thus needed medical care." *Pittman*, 108 F.4th at 570. To prevail, an inmate must show that the treatment decision was "blatantly inappropriate." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

Only Officers Jennifer Hendricks, Samantha Howard, and Donna Tapia remain as individual defendants from the Marshall County Sheriff's Department.[3] They assert qualified

---

[3] The parties met and conferred about summary judgment before briefing, and the court applauds their compliance with this practice. The Estate has agreed to dismiss claims against Sergeant Shan Jolley, Officer Devin Johnson, and Officer L.K. Kowalski, so the court treats these as abandoned and focuses on the individuals in dispute.

immunity. They also argue that no reasonable jury could find their actions objectively unreasonable, and in doing so rely heavily on the medical deference rule.

The defense of qualified immunity "shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Marshall v. Allen*, 984 F.2d 787, 791 (7th Cir. 1993) (quotations omitted). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). If no constitutional right was violated, there is no need for further inquiry. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If a violation can be made, the next step is to ask whether the right was clearly established; this inquiry must be undertaken considering the particular circumstances of the case. *Id.*

The court may address either prong first. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "A constitutional right is clearly established for qualified-immunity purposes [when the] contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 725 (7th Cir. 2013) (quotations omitted). "[A] case holding that the exact action in question is unlawful is not necessary," *Alicea v. Thomas*, 815 F.3d 283, 291 (7th Cir. 2016), but the law does not "define clearly established law at a high level of generality since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances," *McGee v. Parsano*, 55 F.4th 563, 572-73 (7th Cir. 2022) (quotations omitted). The plaintiff bears the burden of proving that "every reasonable officer must have understood that deferring to the judgment of medical staff in these circumstances was unlawful." *Id.* at 572.

10

The law has "long recognized that correctional institutions typically engage in the division of labor between medical professionals and other security and administrative staff." *Id.* at 569 (quotations and citations omitted). "Established circuit precedent entitles a corrections officer to defer to the judgment of medical professionals." *Id.* at 566 (awarding officers qualified immunity for deferring). "If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands," *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005), or "generally trust[ing] the professionals to provide appropriate medical attention," *McGee*, 55 F.4th at 569. Indeed, the law encourages jail staff to defer to the judgments of medical professionals "without fear of liability for doing so." *Id.* (quoting *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010)).

Liability attaches "if jail officials had reason to know that their medical staff were failing to treat or inadequately treating an inmate." *Miranda*, 900 F.3d at 343. Officers may not ignore a pretrial detainee, *Berry*, 604 F.3d at 440-41, and "[o]fficers can be placed on notice of a serious medical condition either by word or through observation of the detainee's physical symptoms," *Est. of Perry v. Wenzel*, 872 F.3d 439, 454 (7th Cir. 2017). Prison officials may rely on medical judgment "even when an inmate is in obvious distress and even when the medical staff has misdiagnosed an inmate" unless those officers "have reason to know that an inmate is receiving inadequate treatment." *McGee*, 55 F.4th at 573.

The jail officials here often alerted a healthcare professional, Nurse Loftus, of the problems [54-10 Tr. 13-14; 58-19 at 6]. Ms. Helbling may not have been treated properly or diagnosed correctly, but she wasn't always ignored. *See Berry*, 604 F.3d at 440 (consulting with medical staff and timely responding to detainee's complaints sufficient). Officers checked on her

multiple times by video and in person [54-5], and Nurse Loftus saw her too [58-6 Tr. 21, 31]. The Estate's proposed medical expert (Dr. Krista Brucker), when asked, testified that "I think I understand that the jail officer requested or somehow arranged for the nursing team to evaluate the patient, I'm not sure there's much more the jail staff should have done at that point" [58-12 Tr. 74]. The doctor acknowledges that this record shows no reported cough, normal vital signs, and no complaints of shortness of breath, the kinds of signs that would usually alert officers that someone is suffering from pneumonia [*id.* Tr. 54]. The Estate cites testimony from Shelly Truty, but she testifies as an experienced licensed practical nurse, not as a correctional officer [58-5 Tr. 4-5]. The relevant question is not whether a trained nurse would have known to call medical, but whether a reasonable officer at the scene should have called, based on what an officer saw or knew at the time, "not with the 20/20 vision of hindsight." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

Ms. Helbling didn't alert the officers that she needed assistance or was in pain on this record [54-5]. *Cf. Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 939 (7th Cir. 2015) (officers ignored direct complaint from inmate). In most cases, at least with Officers Hendricks and Howard, they followed Nurse Loftus's instructions to monitor Ms. Helbling and to make sure she was eating and drinking. The officers could not have been expected to know that Ms. Helbling was suffering from bilateral pneumonia; at least the record offers no evidence from which a reasonable jury could make this finding. She wasn't observed coughing, and her vital signs remained fairly normal, not in line with 80-90 percent of pneumonia patients, according to Dr. Brucker's testimony [58-

12 Tr. 52-54].[4] These officers were justified in deferring to medical personnel. The Estate nonetheless raises specific instances when she says officers should have acted differently, so the court addresses each. In doing so, although Officer Tapia at times followed medical instructions, her interactions with Ms. Helbling and her lack of compliance at other times, and hers alone, as judged objectively, are sufficiently different to permit a reasonable jury to find against her.

     1. *Admission.*

The Estate claims that Officer Hendricks violated Ms. Helbling's constitutional rights by admitting her to the jail in the first place. Officer Hendricks performed Ms. Helbling's initial intake [58-15]. She worked as main control, and her responsibilities included "[b]ooking and releasing inmates" and "caring for inmates" [58-7 Tr. 6]. She underwent training with Officer Tapia in how to care for, book, release, and feed inmates. The training required her to pass levels before advancing. She also confirmed that QCC provided additional training [*id.* Tr. 16].

Officer Hendricks performed the required medical intake questioning and recorded Ms. Helbling's reported blood pressure issues, recent hospitalization, drug use, and recent suicide attempt [58-15]. She also noted Ms. Helbling's asthma (and the inhaler in her car) and that Ms. Helbling reported coughing up "green stuff" that could be explained by smoking a cartilage that contained marijuana [*id.*]. She didn't take Ms. Helbling's vitals, but she explained "[i]f [the inmate] is standing there talking to you and fine, and you don't see a major concern for it, you don't have to" [58-7 Tr. 18]. She testified that Ms. Helbling wasn't having breathing problems at that time because she was speaking [*id.* Tr. 23].

---

[4] Dr. Brucker is the Estate's proposed expert witness [58-12 Tr. 5]. Dr. Brucker is certified in emergency medicine and addiction medicine, and she practices both [*id.* Tr. 9]. She works as an emergency room physician at Memorial Hospital and at Oaklawn Community Mental Health in South Bend, Indiana [*id.* Tr. 9-10]. She reviewed the record in this case and drafted a report [*id.* Tr. 18].

The Estate points out that Officer Hendricks didn't remember whether she weighed Ms. Helbling, and she didn't sign the intake sheet [58-15 at 2], but neither one of these things rises to the level of constitutionally inadequate medical care or sufficiently would tell a reasonable officer that she was violating a right. Ms. Helbling could respond to questions coherently and lacked any physical difficulties at the time of her admission, outside of her report that she coughed up mucus. She was described as emaciated (weighing initially at 107 pounds and the coroner later recording 70 pounds)—and no doubt a reason why medical staff insisted on ongoing food and water—but the Estate never establishes how this would reveal to Officer Hendricks that Ms. Helbling had bilateral pneumonia. Dr. Brucker testified that she wouldn't have expected a jail officer to perform a physical assessment, which may have revealed more symptoms [58-12 Tr. 72].

And the Estate points to no law or case that requires more of an assessment. The Estate argues that Officer Hendricks's failure to consult a nurse or doctor before admitting Ms. Helbling failed to comply with the requirement that inmates be deemed fit for admission. On this record, Officer Hendricks followed admission protocol and left further medical documentation for the nurse; and following that protocol here was not objectively unreasonable, particularly when nothing indicated a different or emergent response. Nurse Loftus testified that she looked through every single inmate's medical jail intake form [58-6 Tr. 17]. Officer Hendricks placed Ms. Helbling in special observation—whether for suicide watch or detox the parties debate—but in special observation nonetheless.

Nothing shows this admission was a constitutional violation on Officer Hendricks's part, much less that it would have been a clearly established one. The Estate points to no similar cases establishing that not weighing someone or not seeking a medical consultation for an inmate

actively responding and offering modest notes of her medical conditions violates the Constitution. Officer Hendricks's admission may not have been textbook (*e.g.*, missing a signature), but no rational jury could find it objectively unreasonable, not least when she put Ms. Helbling in an observation cell to be watched and placed the intake sheet in the nurse's box for special attention. Officer Hendricks is entitled to qualified immunity here; and no reasonable jury could find that her actions in admitting Ms. Helbling violated the Fourteenth Amendment.

> 2. *Detention.*

The Estate argues that Officers Hendricks, Tapia, and Howard ignored Ms. Helbling's medical needs throughout her time at the Marshall County Jail. The Estate emphasizes different times when the officers should have sought emergency medical attention—in particular, when Officer Hendricks found Ms. Helbling with vomit on the floor on May 22, and that same day when Officer Tapia observed changes in her physical condition. The Estate argues that a jury should determine whether Ms. Helbling's deterioration required a phone call to medical providers.

The Estate also contends that the officers could not rely on Nurse Loftus's occasional treatment when she wasn't present for most interactions and wasn't providing Ms. Helbling with meaningful care. The Estate adds that the officers are not entitled to defer to medical decisionmaking when the jail was understaffed with medical providers. The Estate says none of the officers can point to anything Nurse Loftus recommended that they then followed. Officers Tapia and Howard, the Estate argues, did not even follow Nurse Loftus's instructions.

The officers argue that they didn't know that Ms. Helbling had pneumonia, that they didn't ignore medical staff, and that her symptoms would not have obviously indicated to a layperson

that she had pneumonia. Instead, they say nothing during this period would have alerted them, as non-medical staff, to take any action beyond monitoring and documenting her condition.

        a. *Officer Hendricks*.

On May 22, in the early morning hours, one officer (Officer Johnson) noticed vomit on the floor of Ms. Helbling's cell and alerted Officer Hendricks. From the video, it took about twenty minutes for officers to observe this to have the cell cleaned. Rather than disregard the situation once noticed, Officer Hendricks (with her partner in tow) checked on Ms. Helbling. No reasonable jury could find that Officer Hendricks followed an objectively unreasonable protocol of care on this record.

The Estate points to the QCC clinical care analyst's testimony that "[a]ny time we would see something like that, that would warrant a phone call" to medical [58-5 Tr. 37]. To this point, Officer Hendricks spoke with Ms. Helbling, performed a medical screening protocol for nausea and vomiting, and took her vital signs. Dr. Brucker confirmed her vitals were normal (as recorded on the protocol form) [58-12 Tr. 54 ("Her vital signs are normal as we have them.")]. The officers provided her water and watched her drink it. They cleaned the cell and reminded Ms. Helbling to activate the intercom if she needed additional help.

Vomiting can indeed be a serious medical event, *see, e.g., Gayton v. McCoy*, 593 F.3d 610, 621 (7th Cir. 2010), but not every instance is. There is no evidence here that this was continuous or chronic or that this episode would indicate to a reasonable officer a greater emergency. Officer Hendricks observed no coughing, wheezing, or difficulty breathing from Ms. Helbling. Instead, Ms. Helbling told Officer Hendricks that she was detoxing. Officer Hendricks completed the

protocol form for vomiting and texted the form to Nurse Loftus.[5] It may not have been a phone call, but this care and instant follow-up to medical cannot be characterized by a rational jury as objectively unreasonable, nor under the law does it deprive Officer Hendricks of the right, within the division of labor at the jail, to alert and then rely on medical staff to assess next steps for treatment. Officer Hendricks responded to the new event in a way that ensured additional treatment.

Indeed, on this record, Nurse Loftus knew that morning that Ms. Helbling had vomited [58-6 Tr. 34, 51-52]. After the officers filled out the protocol, Nurse Loftus saw Ms. Helbling that same morning [*id.* Tr. 29-30]. She coordinated medication for nausea and upset stomach with Dr. Tchaptchet [*id.* Tr. 30]. Then she placed Ms. Helbling on a four-hour safety watch and told officers to "continue to encourage patient to sip water and eat small amounts of food to prevent vomiting and dehydration" [*id.*]. The observation notes indicate that the officers monitored Ms. Helbling [54-5]. They kept documentation of her eating and drinking starting that same day [58-19 at 2]. In following these instructions, and without new or additional information that would indicate a greater medical worry, Officer Hendricks cannot be said to have had "reason to know that the medical staff was failing to treat or inadequately treating" Ms. Helbling. *McGee*, 55 F.4th at 569 (quoting *Miranda*, 900 F.3d at 343).

Officer Hendricks ended her shift at 7:00 a.m. on May 22 and notified the next shift about the vomiting. Her involvement in this tragic story seems to conclude there. On this record,

---

[5] The Estate questions whether this text occurred because none could be produced in discovery. Officer Hendricks testified under oath it occurred. That has not been put in factual dispute, and the court must proceed on what evidence exists, not on what evidence does not exist.

Officer Hendricks is entitled to qualified immunity; and no reasonable jury could conclude that her conduct was objectively unreasonable. The court grants summary judgment for this officer.

>    b. *Officer Tapia.*

Neither medical deference nor qualified immunity shields Officer Tapia as a matter of law. Officer Tapia arrived for her shift at 1:00 p.m. on May 22. Another shift had occurred between hers and that of Officer Hendricks, so Officer Tapia says she was unaware that Ms. Helbling had vomited before [58-8 Tr. 31]. Around 2:00 p.m. on May 22, Nurse Loftus initiated a withdrawal flowsheet for Ms. Helbling (prescribed by the doctor) and recorded her vitals [54-6 Tr. 55; 58-19 at 7; 58-5 Tr. 25]. She instructed jail staff, including Officer Tapia, to ensure Ms. Helbling was eating and drinking [58-19 at 4; 54-6 Tr. 29-30].

Officer Tapia says she noticed no coughing or difficulty breathing and had "a normal conversation" with Ms. Helbling at one point [54-12 Tr. 51-52], but then things changed, or so a reasonable jury could say. The Estate claims that Ms. Helbling can be seen spewing liquid on the floor in front of multiple jailers and the nurse at about 1:56 p.m. on May 22—indeed, the only time she can be seen doing so on camera. Though the court has difficulty seeing any spewing, the video shows liquid on the floor at Ms. Helbling's feet that isn't there minutes earlier [60 (Ex. 15 Observ. Cell) at 13:56-58]. In that same footage, Nurse Loftus and other gloved officers (unidentified) change and clean Ms. Helbling, putting the smock she was wearing into a plastic bag [*id.* 13:56:48-57]. This suggests that there was a reason Ms. Helbling needed to be cleaned, and Nurse Loftus notes that she was "messy" [58-6 Tr. 31]. Ms. Helbling had reported vomiting to Nurse Loftus earlier that day too [*id.* Tr. 29-30].

Curiously, no entry records this interaction on the Special Watch Observation Records [54-5]. Officer Tapia seems to have been there, as she notes that her first interaction with Ms. Helbling was with Nurse Loftus and two other jailers and included making sure Ms. Helbling had a clean smock [58-8 Tr. 23]. This reasonably puts in dispute whether Officer Tapia was aware Ms. Helbling had been vomiting, or at least that she had needed assistance changing and getting cleaned up from doing so.

There is more. Officer Tapia confirms Nurse Loftus instructed her to call "if [Ms. Helbling's] demeanor changed in any way" [54-12 Tr. 52]. Around 5:44 p.m. on May 22, Officer Tapia checked on Ms. Helbling, who appeared cross-eyed and non-sensical [54-5 at 3; 54-12 Tr. 29-30]. It concerned her enough that she made note of it in the jail's observation records [54-5 at 3; 54-12 Tr. 30], but she never communicated the information, as instructed, to medical staff, though in practice Nurse Loftus often depended on an officer telling her that a detainee was deteriorating [58-6 Tr. 32-33].

The Estate argues that this behavior should have alerted Officer Tapia that Ms. Helbling needed immediate medical care. The QCC clinical care analyst testified that this warranted a call to medical, especially in light of Ms. Helbling's prior attempt to get into the shower with her suicide smock on—something that indicated substantial confusion [58-5 Tr. 55-56]. Nurse Loftus had already told Officer Tapia that this warranted a call. And by this time, Officer Tapia had before her an emaciated and frail woman who did not look healthy (to use Officer Tapia's own words [58-8 Tr. 45-47]), who was on a nausea and vomiting protocol (having vomited), and whose demeanor now changed with sudden strabismus and incoherence. Even if temporary, Ms. Helbling's demeanor changed in ways that could be indicative of serious medical needs, not least

an infectious process. Infections (including pneumonia) are well known to cause confusion, and an adult's eyes don't suddenly become crossed absent something more significant, including by way of trauma, stroke, or infectious or disease process.

Officer Tapia made the decision not to call Nurse Loftus. In that moment, a reasonable jury could say Officer Tapia wasn't deferring to medical instructions; she was making her own medical decision—for example, that perhaps Ms. Helbling's crossed eyes stemmed from the inmate merely being in a prone position. Correctional officers cannot claim to defer to a medical professional when they know that the medical professional isn't informed and thus isn't caring for the inmate. *Miranda*, 900 F.3d at 343. Nurse Loftus instructed Officer Tapia to provide this exact information, and Officer Tapia decided not to follow this instruction. Officer Tapia cannot claim to be deferring to an uninformed provider, at least when a reasonable jury could say she decided to withhold the information the nurse instructed her to give. A reasonable jury could call this conduct objectively unreasonable, and indeed knowing or reckless.

The court acknowledges, to Officer Tapia's credit, that she sat Ms. Helbling up and spoke to her, that Ms. Helbling asked for more water and "made sense" [58-8 Tr. 55], that for dinner around 6:00 p.m. Officer Tapia made sure that she ate a little bit and drank some fluids [*id.* Tr. 25], and that observation logs show that Officer Tapia checked on Ms. Helbling again in her cell around 9:45 p.m. [54-5 at 2]. In contrast, the following morning when Officer Tapia interacted again with Ms. Helbling, she observed that Ms. Helbling had urinated on the floor (also reasonably a sign of confusion or infection); and, though Officer Tapia believed it necessary to have medical in right away that morning to see Ms. Helbling, on this record the officer again never reported the changes in Ms. Helbling's demeanor to the nurse [58-8 Tr. 37]. These

interactions only underscore the genuine issues of whether Officer Tapia's conduct was objectively unreasonable and whether she acted recklessly (or knowingly); and weighing these competing facts must be reserved for the jury. *See Est. of Perry*, 872 F.3d at 454 ("[S]imply because [the inmate] received treatment at some point during his detention does not completely absolve the officers from liability as a matter of law.").

That then leaves only the question of qualified immunity for Officer Tapia, and in particular whether the constitutional right here was clearly established. *See McGee*, 55 F.4th at 572-73. The Estate must show that "every reasonable officer must have understood that deferring to the judgment of medical staff in these circumstances was unlawful." *Id.* at 572. The Estate directs the court to *Dobbey*, 806 F.3d at 940, a case in which a guard ignored a prisoner with a tooth abscess, for the proposition that "a guard who is aware of complaints of pain and does nothing to help a suffering prisoner obtain treatment is [] exhibiting deliberate indifference" because "[h]e knows the prisoner may be suffering and knows whom to call to attend the matter."

No less here, because Officer Tapia had been explicitly told to report any changes in demeanor to a medical professional. An officer can be placed on notice of a serious medical condition either by word or through observation of the detainee's physical symptoms, and that can include specific medical instructions that guide what to do with these observations. In *Est. of Perry*, 872 F.3d at 454-55, for instance, the officers received medical orders to get help if the inmate experienced irritability, drowsiness, or confusion. Officers dragged him (a known seizure patient) because he could not walk. He moaned, defecated, and urinated. This circuit found that a jury could conclude that it was unreasonable for the officers not to seek medical care on his behalf. That's effectively what a reasonable jury could say Officer Tapia did here—she made her

own call that a frail, emaciated, unhealthy, urinating, and vomiting woman, now turned cross-eyed and incoherent and thus worthy of medical attention as instructed by a nurse, was not worthy of informed attention by a medical professional. Dr. Brucker testified that even intervention at this point possibly could have prevented Ms. Helbling's death [58-12 Tr. 82-83]. A jury must decide whether Officer Tapia making that choice was constitutionally unreasonable or whether Ms. Helbling really did not present a medically emergent situation. *See Est. of Perry*, 872 F.3d at 454-55. The court denies summary judgment for Officer Tapia.

c. *Officer Howard.*

It seems Officer Howard was not privy to what Officer Tapia observed on May 22, nor received (at least on this record) the explicit instruction to advise medical of any changes in status or demeanor. Officer Howard worked her May 22 shift from 3:00 to 11:00 p.m., and then started again at 7:00 a.m. on May 23 [58-9 Tr. 45].

Officer Howard saw Ms. Helbling around 9:45 p.m. on May 22 and brought her water and asked how she was feeling [54-12 Tr. 22; 54-5 at 2]. Officer Howard testified that Ms. Helbling's condition seemed to be just continuous without any significant change from when the nurse saw her. Nothing on this record shows that Officer Howard knew about the vomiting or that she was aware Ms. Helbling had been cross-eyed and incoherent, and she reports seeing nothing that would have warranted a call to medical [58-9 Tr. 69].

The next time Officer Howard encountered Ms. Helbling was on May 23, when she verbally checked on Ms. Helbling around 8:02 a.m. and noted that Ms. Helbling nodded when asked if she was okay [54-5 at 1]. Around 8:12 a.m., Officer Howard brought Ms. Helbling breakfast and left her breakfast in the booking area when Ms. Helbling didn't respond other than

to nod her head [58-9 Tr. 48-49; 54-13 Tr. 51]. She alerted Officer Tapia that Ms. Helbling didn't want breakfast, and Officer Tapia planned to come back after med-pass to make sure she ate [58-8 Tr. 39].

The next time Officer Howard saw Ms. Helbling was when Officer Tapia found her unresponsive and called for help, and she helped try to revive Ms. Helbling [58-9 Tr. 55-56; 54-14 at 3]. No reasonable jury could conclude, based on Officer Howard's limited involvement, that she should have known Ms. Helbling wasn't being cared for or needed additional medical attention. Nothing on this record indicates she acted unreasonably.

She is entitled likewise to qualified immunity. No clearly established law indicates this officer wasn't entitled to defer to medical professionals; instead, the law acknowledges that officers such as her, based on this record, lacked the capacity to make further diagnosis or to see the need to call a nurse or doctor because of more emergent situation than the nurse had already identified. *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (officers not deliberately indifferent because they lacked the capacity to know that the medical professionals had made an incorrect diagnosis). The court grants summary judgment for Officer Howard accordingly.

B.  *Monell Claim against the Marshall County Sheriff (Count 2).*

The Estate clarifies that it pursues claims against Sheriff Matt Hassel (Marshall County Sheriff's Department) only in his official capacity. The Estate alleges five *Monell* theories against the Sheriff. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). The Estate says there was a failure to train jail staff to identify serious medical conditions or to determine an inmate's fitness for confinement; a custom of allowing inmates to be admitted to the jail without a proper medical

examination; a failure to provide and maintain adequate medical space at the jail; understaffing of the jail with qualified medical staff; and insufficient detoxification protocols.

Under § 1983, a person may sue anyone who, while acting under color of state law, deprives her of a constitutional right. *Connick v. Thompson*, 563 U.S. 51, 60 (2011). The Sheriff may be held liable under § 1983 only if "execution of [his] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694. There are three paths to such liability—an express policy, a widespread custom, or a deliberate act by a decisionmaker with final policymaking authority. *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005). All told, to succeed on this § 1983 claim, the Estate must establish that (1) Ms. Helbling suffered a deprivation of a federal right (2) as a result of an express policy, a widespread custom, or a deliberate act of a decisionmaker with final policymaking authority (3) that proximately caused her injury. *King v. Kramer*, 763 F.3d 635, 649 (7th Cir. 2014).

There is no vicarious liability under § 1983. *Howell v. Wexford Health Sources Inc.*, 987 F.3d 647, 653 (7th Cir. 2021). The official policy requirement for § 1983 liability distinguishes the county's acts from those of the Sheriff's employees, and thereby ensures that the sheriff department's liability is limited to action for which it is actually responsible. *Est. of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)); *see, e.g,. Fain v. Wayne Cnty. Auditor's Off.*, 388 F.3d 257, 261-62 (7th Cir. 2004).

A policy may be "one of action or inaction"—indeed, the failure to have a policy may be actionable if there is a "conscious decision not to take action." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 380-81 (7th Cir. 2017). "But the path to *Monell* liability based on inaction is steeper

because, unlike in a case of affirmative municipal action, a failure to do something could be inadvertent and the connection between inaction and a resulting injury is more tenuous." *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 378 (7th Cir. 2020). When "a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997).

Most often, "[t]o prove an official policy, custom, or practice within the meaning of *Monell*, [a plaintiff] must show more than the deficiencies specific to [her] own experience, of course." *Daniel v. Cook Cnty.*, 833 F.3d 728, 734 (7th Cir. 2016). But "a single incident can be enough for liability where a constitutional violation was highly foreseeable." *Miranda*, 900 F.3d at 344. In the face of actual knowledge of a well-recognized risk, "[t]here is no magic number of injuries that must occur before [an entity's] failure to act can be considered deliberately indifferent." *Glisson*, 849 F.3d at 382.

In addition to establishing an official policy, widespread custom, or action by an official with policymaking authority, the Estate must show that the Sheriff's deliberate conduct was the "moving force behind [the] constitutional injury." *Est. of Perry*, 872 F.3d at 461; *see also J.K.J.,* 960 F.3d at 377. It is "well-established" law that a plaintiff bringing a *Monell* claim "must do more than simply rely upon [her] own experience to invoke *Monell* liability." *Est. of Perry*, 872 F.3d at 461 (citing *Daniel*, 833 F.3d at 734). More than "one or two missteps" is required, and the plaintiff "must show policymakers knew of the deficiencies and failed to correct them." *Hildreth*, 960 F.3d

at 426. If a plaintiff cannot show this, the claim fails. *Id.* (citing *Greiveson v. Anderson*, F.3d 763, 774 (7th Cir. 2008) (four incidents in eleven months with a single plaintiff not enough)).

The Sheriff argues that the Estate cannot show an official policy or widespread custom or that any such policy or custom caused the alleged constitutional deprivation—namely, Ms. Helbling's tragic death from pneumonia after a failure to provide adequate medical care. Rather than marshal evidence of an official policy, widespread custom, or official policy decisionmaking, the Estate instead focuses on the single incident involving Ms. Helbling, arguing "a single incident can be enough for *Monell* liability where a constitutional violation was highly foreseeable," *Miranda*, 900 F.3d at 344, or a "highly predictable consequence," *Connick*, 563 U.S. at 63-64.

But this record indisputably shows this is not one of those instances. Nothing on this record would have put the Sheriff on notice that his practices were insufficient for purposes of these *Monell* claims. The Estate has pointed to no widespread custom and to no official policy that motivated this incident. The Estate claims that "policy decisions alone" should be sufficient, but she has identified no official policy decisionmaking that caused a constitutional violation here. *See, e.g., King*, 680 F.3d at 1021 (seven articles expressing concern over jail medication policy and sheriff's testimony about the same jail). In addition, as the Sheriff argues, the Estate hasn't established the necessary causal connection between such official decisionmaking and the underlying deprivation—Ms. Helbling's tragic death from pneumonia after the failure to provide adequate medical care.

First, the Estate identifies no other instances that would have put policymakers on notice that the jail staff hadn't been properly trained to identify serious medical conditions like withdrawal, and more particularly pneumonia in that mix; and patterns are usually necessary to

demonstrate failure to train, *Connick*, 563 U.S. at 62, or at least some evidence that the need for training was so obvious that the Sheriff's failure to train permits an inference of institutional culpability, even without a similar prior constitutional violation, *J.K.J.*, 960 F.3d at 380. The Estate notes that the contract between QCC and the jail required adequate training, so argues that this shows the Sheriff knew the importance of training. The Estate claims that the jail officers unanimously testified that they received no formal training from either the Marshall County Sheriff's Department or QCC in the intake process. But Officer Hendricks testified that there were training videos and that "you have to watch these videos, and you answer questions, and then you have to pass a test to make sure that you actually comprehended it" [58-7 Tr. 56]. Officer Howard described training from other jailers on the intake process, including a video described as "competent in conducting intake screening;" she just noted that she didn't remember "receiving any actual healthcare training regarding intake screening" [58-9 Tr. 28]. She didn't remember withdrawal training specifically, but she remembered other medical training, including medication protocol and CPR [*id.* Tr. 26]. Officer Tapia described going over basic things at jail school, including "things to look for" and said the medical staff told officers to look for certain things if they suspected a problem [58-8 Tr. 16]. She described protocols for certain things, like taking vitals [*id.* Tr. 17]. Only Officer Johnson responded that he hadn't received training, but even he agreed that there was "on-the-job training with other jailers" [58-13 Tr. 27]. Nurse Truty, the QCC care analyst, testified that QCC puts on training for medical and mental health annually [58-5 Tr. 20], although she couldn't say whether Marshall County participated every year [*id.* Tr. 21]. Nurse Loftus testified that the jailers and deputies did a class and then had to pass a test [58-6 Tr. 37]. This training, though it may not have been strenuous enough to classify the officers as

nurses or doctors, doesn't equate to a "predictable disaster," especially when the jail utilized medical professionals to review medical conditions of its inmates, including Ms. Helbling, and when no other incidents put the Sheriff on notice that the training would likely lead to constitutional violations. *See Newbon v. Milwaukee Police Dep't*, 2011 U.S. Dist. LEXIS 98278, 17 (E.D. Wis. Aug. 30, 2011). On this record, Ms. Lowder cannot point to this incident alone to sustain a failure to train claim for a reasonable jury.

The second theory—that a custom existed of allowing inmates to be admitted to the jail without a proper medical examination—fails for similar reasons, for the Estate cannot show this was a widespread custom or official policy. The Estate only points to what happened here. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 596 (7th Cir. 2003) (plaintiff's personal knowledge of two other incidents insufficient). And even here, there was nothing a reasonable jury could call unconstitutional by way of the jail's intake. Ms. Helbling was questioned by an intake officer and soon thereafter was seen by a nurse. Ms. Helbling's experience, standing alone, though incredibly tragic, cannot sustain a *Monell* claim. *See Thomas*, 604 F.3d at 303-04 ("isolated act of an individual employee" not sufficient).

The Estate's third and fourth theories—that the jail lacked proper medical space and that the Sheriff understaffed the jail with medical personnel—likewise fail. For one, the Estate develops no record to permit a reasonable jury to conclude that having more medical space would have avoided any constitutional deprivation here. Officers regularly saw Ms. Helbling. Medical staff regularly saw Ms. Helbling. They regularly saw her alone, without interference or distraction from other inmates. The jail had a patient exam room too [58-6 Tr. 39]. The Estate cites no

authority that a jail must have onsite medical facilities. *See Kudla v. City of Hammond*, 2022 U.S. Dist. LEXIS 107482, 24-25 (N.D. Ind. June 16, 2022).

For another, the Sheriff employed or contracted with medical professionals to provide care to inmates. The Estate falls short of adducing evidence for a reasonable jury to say more medical staff would have prevented this tragic incident—in other words, that a shortage of staff caused it. *See Thomas*, 604 F.3d at 306. Ms. Helbling saw a nurse [58-5 Tr. 24], and she was eventually taken offsite once officers realized the severity of her condition [54-14]. *Cf. Petrig v. Folz*, 581 F. Supp.2d 1013, 1019 (S.D. Ind. 2008) (having no medical personnel onsite and not transporting an inmate in distress to a hospital were "suspect practices or policies"). The jail maintained a policy of medically screening every inmate [58-6 Tr. 15]. Nurse Loftus, whom the Estate calls unqualified, is a licensed LPN [*id.* Tr. 8]. She worked 7 days a week—12 hours Monday-Friday and 4-6 hours on the weekends [*id.* Tr. 11]. She could call the doctor anytime [*id.* Tr. 13] and testified that she could handle the number of inmates [*id.* Tr. 18]. Medical staff was regularly onsite, on a fairly common schedule. Although some facilities have more physician visits, and some have less than Marshall County's once a week visit, it was "very common" to have a physician visit once a week in line with this jail's practice [58-5 Tr. 12, 47]. And if an inmate needed to be transferred to a medical facility, the officers could call paramedics or the nurse, who would call the doctor [58-6 Tr. 15-16]. Nothing on this record, outside of this case, would have put the jail on notice that these practices would likely lead to a constitutional violation or that these practices caused a constitutional deprivation. *Hildreth*, 960 F.3d at 426.

That leaves then the Estate's fifth theory—that there were insufficient detoxification protocols. This strikes a bit inconsistent. The Estate argues that the jail had insufficient

withdrawal protocols while, at the same time, complains that staff failed to follow the withdrawal protocols [*e.g.*, 57 at 19-20]. The Estate at times criticizes the detox protocol but never disputes that the jail had one. Nurse Loftus described the usual detox protocol as starting once an inmate had vomited or had diarrhea—when "jailers [had] observed something" indicating active detoxing—but not just upon admission to start medications [58-6 Tr. 43]. Even if official decisionmaking resulted in this detox protocol, the Estate has not developed a record from which a reasonable jury could conclude that it caused a constitutional deprivation here. Ms. Helbling died of complications from bilateral pneumonia, and officers and medical staff rendered medical and other care to her, including after she vomited and including medications, water, and food, in an attempt to address what they believed was detoxification. The protocols existed; her condition just required other care that was not timely identified. There may be grounds then for an individual liability, but not *Monell* liability. The court grants summary judgment on this front.

C.  *State Claims against Marshall County Defendants (Count 3).*

The Estate also brings state law negligence and wrongful death claims against QCC and the Marshall County defendants. QCC acknowledges that triable issues of fact exist, but the Marshall County defendants primarily argue that these claims are barred by the immunity granted under the Indiana Tort Claims Act (ITCA).

Before turning to this subject of immunity, the Marshall County defendants posit, without citing any legal authority, that Ms. Helbling didn't suffer any violation of her constitutional rights, so her negligence and wrongful death claims necessarily fail. Though on occasion state law tort claims might mirror the standard for constitutional claims (*e.g.*, excessive force and battery), the defendants offer no authority for believing that is true for Fourteenth Amendment claims and

comparatively state negligence and wrongful death claims. The court isn't "obliged to research and construct legal arguments for parties." *Nelson*, 657 F.3d at 590; *accord Gross v. Town of Cicero*, 619 F.3d 697, 704 (7th Cir. 2010). And this undeveloped argument seems illogical: surely one can be negligent without behaving unconstitutionally. The court will only address the slightly more developed arguments, first for the individual officers and then for the Sheriff.

Prison officers working within the official scope of their employment are immune from tort liability. *See* Ind. Code § 34-13-3-5; *Ball v. City of Indianapolis*, 760 F.3d 636, 645 (7th Cir. 2014); *see, e.g., Smith v. Ind. Dep't of Corr.*, 871 N.E.2d 975, 986 (Ind. Ct. App. 2007) ("prison officers are shielded from liability in their official capacity under the [ITCA]"). "The grant of tort immunities to public employees involved in law enforcement is commonplace[.]" *Julian v. Hanna*, 732 F.3d 842, 848 (7th Cir. 2013); *accord Feldhake v. Buss*, 36 N.E.3d 1089, 1093 (Ind. Ct. App. 2015) ("In general, a plaintiff may not maintain an action against a government employee if that employee was acting within the scope of his employment."). Conduct falls within the scope of a person's employment when it is "of the same general nature as that authorized, or incidental to the conduct authorized." *Celebration Fireworks, Inc. v. Smith*, 727 N.E.2d 450, 453 (Ind. 2000) (citation omitted).

To sue a prison officer personally, the Estate must "allege that an act or omission of the employee that causes a loss is: (1) criminal; (2) clearly outside the scope of the employee's employment; (3) malicious; (4) willful and wanton; or (5) calculated to benefit the employee personally." Ind. Code § 34-13-3-5(c). No one seriously contends that Officers Tapia, Howard, and Hendricks were acting outside the scope of their employment, so the only question is whether they acted willfully and wantonly, as the Estate pleads and argues. *See* Ind. Code § 34-13-3-5(c)(4); *see also Feldhake*, 36 N.E.3d at 1093 (must plead and prove).

Willful and wanton conduct under the ITCA means either "an intentional act done with reckless disregard of the natural and probable consequence of injury to a known person under the circumstances known to the actor at the time," or "an omission or failure to act when the actor has actual knowledge of the natural and probable consequence of injury and his opportunity to avoid the risk." *Ellis v. City of Martinsville*, 940 N.E.2d 1197, 1204-05 (Ind. Ct. App. 2011). As a statement of elements, "(1) the defendant must have knowledge of an impending danger or consciousness of a course of misconduct calculated to result in probable injury; and (2) the actor's conduct must have exhibited an indifference to the consequences of [her] conduct." *Id.* at 1205.

The federal "objectively unreasonable" standard and Indiana "willful and wanton" standard are similar, but there are key differences—the largest being the subjective component of the Indiana claim. *See Pittman*, 108 F.4th at 570 (no subjective awareness of harm necessary for a Fourteenth Amendment claim). Still, the evidence involved in the federal claim, which requires showing that a prison officer "act[ed] purposefully, knowingly, or perhaps even recklessly with respect to the risk of harm," *Gonzalez*, 40 F.4th at 828, could also be used to support a reasonable jury finding of willful and wanton conduct for the state law claims, albeit against only one of the officers today. In short, the standards are different, but the evidence permits a reasonable jury to make both findings, taking all reasonable inferences in the Estate's favor against Officer Tapia.

The court has already concluded that Officers Hendricks and Howard objectively acted reasonably under the Fourteenth Amendment. No rational jury could conclude that their actions were willful and wanton. The court thus grants summary judgment for Officers Hendricks and Howard on the state law claims in their individual capacity. In contrast, the court has concluded that a reasonable jury could call Officer Tapia's conduct objectively unreasonable, and indeed

knowing and reckless. And because Officer Tapia only argues that the state law claims fail because there was no constitutional violation, the court is left with nothing by way of argument to suggest that a reasonable jury could not also conclude that she acted willfully and wantonly. *See Ellis*, 940 N.E.2d at 1204-05; *see also United States v. Sineneng-Smith*, 590 U.S. 371, 375-80 (2020) (discussing party presentation rule). The court won't grant summary judgment for Officer Tapia in her personal capacity based on this record under the ITCA.

The court notes that the defendants include a mere line in their brief that "the uncontroverted evidence of record confirms that there was no breach of any duties." The defense never expounds on why this is so. Similar to the need to show a breached duty in a negligence claim, *see Gresser v. Reliable Exterminators, Inc.*, 160 N.E.3d 184, 190 (Ind. Ct. App. 2020), an Indiana wrongful death claim requires "a duty owed by the defendant to the decedent, breach of that duty, and an injury proximately caused by the breach." *Tom v. Voida*, 654 N.E.2d 776, 787 (Ind. Ct. App. 1995); *accord Miller v. Schrader*, 2010 U.S. Dist. LEXIS 115547, 21 (N.D. Ind. Oct. 27, 2010). Such duties exist. For one, the Sheriff has a duty to provide medical care to a detainee. *Ne. Ind. Colon & Rectal Surgeons v. Allen Cnty. Comm'rs*, 674 N.E.2d 590, 592 (Ind. Ct. App. 1996); *see also Pittman*, 108 F.4th at 566. For another, Officer Tapia has not demonstrated on this record that no reasonable jury could find that she breached her duties.

The Estate also argues that the Sheriff (MCSD) negligently staffed the jail and supervised the prison officers. The Sheriff counters that the department cannot be held liable for failing to provide Ms. Helbling with proper medical care under a theory of law enforcement immunity, which "reaches activities within the operational purpose and power of the specific law enforcement entity based on the adoption and enforcement of laws, rules, or regulations." *Cento*

*v. Marion Cnty. Sheriff's Off.*, 2018 U.S. Dist. LEXIS 137857, 14 (S.D. Ind. Aug. 15, 2018); *see also King v. Ne. Sec., Inc.*, 790 N.E.2d 474, 482 (Ind. 2003) (ITCA "restricts the immunity to the adoption and enforcement of laws that are within the assignment of the governmental unit").

The Sheriff says the actions of his department and officers involved the enforcement of or failure to adopt rules and regulations *vis-à-vis* Ms. Helbling such that immunity attaches under Indiana Code § 34-13-3-3(8) (formerly subsection 3(7)). This provision shields government entities or employees acting within the scope of their employment from claims regarding the "adoption and enforcement of or failure to adopt or enforce . . . a law (including rules and regulations." Ind. Code § 34-13-3-3(8)(A). The Sheriff admits that officers were acting within the scope of their employment [30 ¶ 103].

The Estate has two responses. First, the Estate says MCSD may still be responsible for the torts of its individual employees for failing to provide medical care within the scope of their duties under a *respondeat superior* theory. *See Barnett v. Clark*, 889 N.E.2d 281, 283-85 (Ind. 2008); *Frazee v. Dearborn Cty. Sheriff's Dep't*, 2017 U.S. Dist. LEXIS 171116, 28 (S.D. Ind. Oct. 17, 2017). Vicarious liability will be imposed on the Sheriff (MCSD) when "an employee has inflicted harm while acting within the scope of [her] employment," *Harrison Cnty. Sheriff's Dep't v. Ayers*, 70 N.E.3d 414, 417 (Ind. Ct. App. 2017) (quotations omitted), for when an officer acts negligently in her "official capacit[y], the Sheriff is responsible" when that negligence causes the injury, *Iglesias v. Wells*, 441 N.E.2d 1017, 1020 n.3 (Ind. Ct. App. 1982). The negligence and wrongful death claims survive against MCSD.

Second, the Estate opposes the application of tort immunity (even if by pointing to a different subsection and type of immunity—namely subsection 3(7)). Subsection 3(8) requires

that "the activity be one in which the government either compels obedience to laws, rules, or regulations, or sanctions or attempts to sanction violations thereof." *F.D. v. Ind. Dep't of Child Servs.*, 1 N.E.3d 131, 138-39 (Ind. 2013) (applying immunity when a government entity was allegedly negligent for failing to pursue delinquency charges); *see also Davis v. Animal Control*, 948 N.E.2d 1161, 1164-65 (Ind. 2011) (applying immunity for city defendants who failed to enforce explicit animal control ordinances); Ind. Code § 34-13-3-3(8)(A).

"The party seeking immunity bears the burden of establishing its conduct comes within the [ITCA]." *King*, 790 N.E.2d at 480 (school district wasn't enforcing a law when providing for school security). The Sheriff asserts immunity under this subsection without explaining what laws, rules, or regulations were adopted and enforced (or not adopted or enforced). Once more, the court cannot abdicate its neutral role of decisionmaking and become an advocate for one side to develop any such argument, particularly when that burden rests on the Sheriff. *See Nelson*, 657 F.3d at 590; *King,* 790 N.E.2d at 480.

In passing, the Sheriff cites *Cento*, 2018 U.S. Dist. LEXIS 137857 at 10-11, which found that this immunity attached to the Marion County Sheriff's failure to institute appropriate protocols for suicide prevention. Perhaps by extension, the Sheriff meant to argue that the MCSD enjoys immunity when the Sheriff negligently implements (or fails to adopt) rules or regulations governing the handling of detoxing or medically infirm detainees, as part of his statutory duties to "detain [people] in custody" and to "take care of the county jail and the prisoners there," Ind. Code § 36-2-13-5, but neither this point nor any other is ever made or developed. And the law is quite clear that the Sheriff has a duty to exercise reasonable care to preserve an inmate's health and safety, including through the provision of reasonable medical care. *See Iglesias*, 441 N.E.2d at

1019; *Trout v. Buie*, 653 N.E.2d 1002, 1008 (Ind. Ct. App. 1995). A reasonable jury could find that the Sheriff breached this duty, without the benefit of immunity, when his jail witnessed an emaciated and deteriorating detainee withdraw, vomit, urinate on herself, act confused, become cross-eyed, cough up green stuff (with a preexisting asthma condition and no inhaler), and often refuse to eat or drink, and when medical witnesses say she needed accurate vitals and a physical examination. Immunity remains the Sheriff's burden to prove, and that has not been done on this summary judgment record as a matter of law.

In the end, the court grants summary judgment on the Estate's state law claims against Officers Hendricks and Howard in their personal capacities but denies summary judgment on these claims against Officer Tapia in her personal capacity and against the Sheriff (MCSD).

D.  *Section 1983 (Monell) Claim against QCC (Count 2).*

QCC acknowledges that questions of material fact exist regarding Ms. Lowder's Fourteenth Amendment and state law wrongful death claims, and the Estate abandons certain other theories, so QCC requests summary judgment only on the remaining *Monell* claim.

A "private corporation that has contracted to provide essential government services is subject to at least the same rules that apply to public entities." *Glisson*, 849 F.3d at 378-79; *accord Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010). Liability cannot rest on a *respondeat superior* theory, so the Estate must show that a QCC-expressed policy or its widespread practice (or official and final decisionmaking) was the "direct cause" or "moving force" behind the constitutional injury. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021); *Pyles*, 771 F.3d at 409-10. A private corporate entity "violates an inmate's constitutional rights if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the

constitutional rights of the prisoners." *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (quotations and citation omitted).

The Estate presents several theories of liability. First, it argues that QCC had a policy and practice of understaffing the Marshall County Jail with medical personnel that led to delays in transferring inmates to medical facilities, intakes without proper screening, and the jail without licensed care providers. Second, the Estate claims that QCC followed a policy of removing inmates with mental health problems or withdrawal symptoms from group cell blocks to single cell blocks that prevented medical assessments or treatments. Third, the Estate says QCC failed to train and supervise employees to screen and monitor sick inmates, including during admission for those inmates suffering from opiate withdrawals. Fourth, the Estate argues that QCC failed to train jail staff properly on various health protocols. Each in turn, the record today will not permit a reasonable jury to find for the Estate.

The Estate argues that understaffing created a "predictably disastrous" situation. It says QCC provided only an LPN, Mary Loftus, who it calls underqualified to provide the necessary medical treatments and assessments. QCC's doctor, Dr. Eric Tchaptchet, visited once a week [54-6 Tr. 12], and the Estate claims this was insufficient, particularly without a qualified individual onsite to keep the doctor apprised. Nurse Loftus testified that she needed to work under a registered nurse (RN), but she could not recall who that was and only remembered working under another LPN (Shelly Tennant) [*id.*]. Nurse Loftus saw Ms. Helbling twice in four days [*id.* Tr. 34, 58]. The Estate argues that Ms. Helbling was never assessed by a qualified medical provider because of this understaffing and compares this case to *Glisson*.

There, the medical professionals had no health plan or means of coordinating healthcare at all. *Glisson*, 849 F.3d at 382. No one reviewed the inmate's medical history for the first 24 days. *Id.* at 376. The inmate was starving and likely began having physical and mental deficiencies because of this. *Id.* at 376-77. The court of appeals found a "hands-off policy"—one "just as much a policy" as 100 percent enforcement or review would be. *Id.* at 379. The court distinguished a case of inadvertence from its case of having effectively this hands-off policy with reference to medical intervention guidelines that required certain procedures that could persuade a factfinder that the medical provider "consciously chose the approach that it took." *Id.* at 380. The medical provider likewise was on notice for years, based on other events at the jail and press about prior deaths, so could reasonably be said to have actively chosen to continue with this hands-off policy. *Id.* at 382.

This case isn't equivalent to the "hands-off policy" in *Glisson*. There was a system of coordinated healthcare in place, even if individuals in that system made poor decisions to follow prescribed or best practices. For instance, Nurse Loftus worked at the jail approximately seventy hours a week, including twelve-hour shifts Monday through Friday [54-6 Tr. 11]. She had been an LPN (licensed practical nurse) since 2012, and she had worked for QCC for four years [58-6 Tr. 5, 8]. She performed a health assessment on inmates [*id.* Tr. 19]. She could (and did) call Dr. Tchaptchet if she needed something [*id.* Tr. 13-14], and the doctor otherwise visited the jail a not-uncommon once a week [58-5 Tr. 47]. If something more emergent arose, Nurse Loftus would contact the doctor, whom she said she always reached, although she also had a list of additional people she could consult [58-6 Tr. 13-14, 19-20]. Aside from her initial medical intake, she would see a detainee if there was a medical need or if a correctional officer or detainee

requested assistance [*id.* Tr. 23]. Inmates could be transferred to outside medical facilities if necessary [*id.* Tr. 16]. Nurse Loftus saw Ms. Helbling twice, and Dr. Tchaptchet prescribed Ms. Helbling medication in response to hearing from Nurse Loftus [54-6 Tr. 30]. Ms. Helbling was also seen by a licensed social worker, Jennifer Ordray [58-10 Tr. 11].

Within this system implemented by QCC, the Estate identifies various failings by Nurse Loftus, and in doing so illustrates that such conduct had nothing to do with understaffing—*i.e.*, that understaffing (even if this one incident could be stretched to be called a "policy") could not be characterized by a reasonable jury as the cause of a constitutional deprivation. *See Dean*, 18 F.4th at 235. Nurse Loftus admitted that she did not do as "in-depth" of an assessment as an RN would do, though she completed a full history and took some vitals [58-5 Tr. 25; 58-6 Tr. 18-19]. She never performed a physical examination [58-6 Tr. 19], though the Estate's proposed expert, Dr. Krista Brucker, testified that this should have been done [58-12 Tr. 38-39]. Ms. Helbling reported at intake that she suffered from asthma and that her inhaler remained in her car, but she never received a replacement inhaler from Nurse Loftus [58-6 Tr. 25-26]. Nor did she report to the doctor that Ms. Helbling had coughed up green stuff, despite the nurse appreciating that this could be indicative of infection [*id.* Tr. 27, 44]. Nor did she report later that a "brown-and-yellow substance" was found in her cell on May 22, though once more potentially indicative of infection [*id.* Tr. 34-35, 58-59].

Cataloguing this evidence and all attendant inferences, as the Estate has, illustrates how a reasonable jury could find individual failings by medical professionals within this system, but not how understaffing, if indeed that could be called QCC's *Monell*-qualifying policy based just on this one instance, caused a constitutional deprivation. Nothing on this record supports a jury

finding that a lack of staffing or that QCC's measure of training to officers resulted in Ms. Helbling's death, and no reasonable jury could say that QCC was on notice of this risk and deliberately ignored it. The Estate's complaints focus on deficiencies within established medical protocols. There were options—proper collection of medical data and proper reports to physicians, just to name two—but the Estate offers no evidence that such things occurred because QCC understaffed the jail, either at intake or during subsequence observations. A system existed for medical review and coordination; it just wasn't always followed in this case. This case thus tracks *Thomas*, 604 F.3d at 306, where understaffing was "too remote" to support a verdict against the sheriff—when officers should have investigated and ensured the inmate's medical condition within the system and staffing that existed. This understaffing theory won't sustain a *Monell* claim against QCC without a causative link. *See Dean*, 18 F.4th at 235.

Second, the Estate takes issue with the practice by QCC to place inmates with mental health or withdrawal symptoms in isolated cells rather than leave them within the general population. The Estate argues that such placement prevented medical assessments and treatments. This argument cannot carry the day because Ms. Helbling's cause of death was acute bilateral pneumonia, not withdrawal or mental health issues, and the constitutional deprivation must be linked to the unconstitutional policy. *See Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 617 (7th Cir. 2022). In addition, this record will not permit a reasonable jury to find that individual placement in this one instance constituted a widespread custom or official policy or, for that matter, that it foreclosed medical assessments; indeed, from this record, it permitted regular visits (if officers or nurses wanted them) and kept Ms. Helbling singularly on camera. If anything, QCC's policy was to treat inmates (*e.g.*, taking vitals every four hours, implementing an asthma

protocol, following a nausea and vomiting protocol); it just wasn't always followed [58-11 Tr. 40-41]. No reasonable jury could find that the individual failings to properly recognize or follow protocols translate to a systemic or official policy-driven constitutional deficiency. *See Dean*, 18 F.4th at 235.

Third, the Estate contends that QCC instituted a poor policy to ensure accuracy and prompt review of medical documents. QCC followed the protocol of letting officers leave written reports in the nurse's mailbox for review—one the Estate calls "archaic" and blames for its inability to ensure that a nurse and then doctor has seen the documents, particularly in a timely manner. The system may seem dated, but Nurse Loftus testified that she reviewed the new medical intake forms every day [58-6 Tr. 17-18]. Additionally, jail staff printed the intake forms the nurse needed to see [58-7 Tr. 17]. Nurse Loftus made personal decisions about what information to share with the doctor, and at times withheld certain information it seems, but the Estate offers no evidence that this one instance reflected regular practice or official policy to withhold such information from the doctor, or that QCC knew from prior experience that it should abandon a rather common nurse-reports-to-doctor protocol to assist with the provision of medical treatment. *See Dean*, 18 F.4th at 235.

Fourth, the Estate argues that QCC failed to train jail staff properly on various health protocols. A plaintiff may take an "alternative path to *Monell* liability" by alleging that the need for more or different training is "so obvious that the [] failure to act can reflect deliberate indifference and allow an inference of institutional culpability, even in the absence of a similar prior constitutional violation." *J.K.J.*, 960 F.3d at 380 (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). This is known as a failure-to-train theory of liability. *Flores v. City of S. Bend*, 997 F.3d

725, 733 (7th Cir. 2021). Though the law has not "absolutely foreclose[d] the possibility that a plaintiff might succeed in proving a failure-to-train claim without showing a pattern of constitutional violations," a plaintiff relying on a failure-to-train theory must still "provide enough evidence of custom and practice to permit an inference that the [entity] has chosen an impermissible way of operating." *Calhoun*, 408 F.3d at 381. For instance, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so obvious" that the first failure to do so could qualify for *Monell* liability. *J.K.J.*, 960 F.3d at 380.

The Estate points out that Ms. Helbling wasn't ever started on the asthma protocol and wasn't placed immediately on the withdrawal protocol because of a disconnect between QCC and jail staff, though she acknowledges Ms. Helbling was eventually placed in the withdrawal protocol. She says this came from a lack of training and became particularly apparent when the officers observing Ms. Helbling didn't identify her deterioration as serious enough to warrant an alert to a healthcare professional. QCC responds that the officers testified only that they didn't remember all their training, not that they hadn't received any, and that QCC lacked notice of shortcomings with its training.

On this record, there isn't any way a reasonable jury could conclude that QCC was on notice that its training of jailers was so obviously lax or nonexistent as to support a failure-to-train theory, much less that prior similar experiences or incidents had occurred to justify concluding that QCC effectively instituted a custom or practice that it knew was an impermissible way of operating. QCC employed a training director who provided training at the buildings the company served [50-4 Tr. 9]. QCC's clinical care analyst, LPN Shelly Truty, testified that jailers received "medical and mental health training annually" from QCC that addressed things like how

to fill out a protocol and how to administer medication [*id.* Tr. 20]. Officer Hendricks confirmed QCC provided training [58-7 Tr. 16]. Marshall County contracted with QCC for training on booking, healthcare tasks, dispensing medication, and suicide risks [42-1 ¶ 3.9]. The Sheriff approved training schedules and could request additional training for a small fee [*id.*]. QCC trained jailers and made other training available. In addition, QCC had its LPN onsite working shoulder-to-shoulder with jailers, and who at times gave those jailers at times medical instructions to follow. Even taking all inferences in the Estate's favor, including that certain officers could not recall all their training, the Estate cannot establish a widespread or official "no-training" policy based on this one event, however tragic, and cannot establish that any one gap in that training was so obvious as to justify institutional culpability. The court thus grants summary judgment for QCC on the Estate's *Monell* claims.

CONCLUSION

Accordingly, the court and GRANTS IN PART and DENIES IN PART the Marshall County defendants' summary judgment motion [52]; and, because the court addresses arguments on their merits and requires no further briefing, DENIES the motion to file a surreply [65]. The court also GRANTS QCC's partial summary judgment motion as to count 2 [49].

Today's ruling leaves the following claims and parties from the third amended complaint: (1) the Fourteenth Amendment claim in count 1 against the Marshall County Sheriff's Department (Sheriff Matt Hassel), Officer Donna Tapia, Quality Correctional Care, Dr. Eric Tchaptchet, Nurse Mary Loftus, and Social Worker Jennifer Cordray, and (2) the negligence and wrongful death claims in count 3 against these same defendants. The court GRANTS summary judgment on all other claims and parties and DIRECTS the clerk to term the other parties.

The court ORDERS the parties to confer and then to file a status report informing the court of any needed dispositive motion on the crossclaim or other proposal for handling (with any proposed schedule for briefing, if necessary) by February 26, 2025, or if the parties are ready to discuss trial readiness and a trial date.

SO ORDERED.

February 5, 2025                           *s/ Damon R. Leichty*
                                           Judge, United States District Court